UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

GEORGE R. GREEN,                                 :

                              Plaintiff,         :

        - against -                              :

MICHAEL J. ASTRUE,                               :
Commissioner of Social Security,

                                                 :

                              Defendant.

---------------------------------------------------------x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:   4/24/2012   |

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
LORETTA A. PRESKA**[*]

08 Civ. 8435 (LAP) (FM)

**FRANK MAAS**, United States Magistrate Judge.

Pro se plaintiff George Green ("Green") brings this action pursuant to

Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), to seek review of a

final decision of the Commissioner ("Commissioner") of the Social Security

Administration ("SSA") denying his application for disability insurance benefits.  The

Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  For the reasons set forth below, I recommend that the

Commissioner's motion be granted in part and denied in part, and that the case be

remanded solely to develop the record with respect to Green's residual functional

capacity ("RFC") and the availability of jobs in the national and local economy consistent

with that RFC.

---

[*]    This Report and Recommendation was prepared with the substantial assistance of
Eric Halperin, a student at Fordham Law School who served as a summer intern in my
Chambers.

I.      Background

        A.      Procedural History

                On September 27, 1999, Green filed an application for disability insurance

benefits.  (See Tr. 120-22).[1]  Green claimed that he was disabled because of a seizure

disorder, severe headaches, weakness in his left hand and arm, and "brain syndrome."

(Id. at 142).  His application was denied initially, and that decision was affirmed on

reconsideration.  (Id. at 43-44, 88-90, 94-97).  Green thereafter requested a hearing before

an administrative law judge ("ALJ").  (Id. at 87).  That hearing began before ALJ

Kenneth L. Scheer on December 4, 2000, and resumed on January 25, 2001, after an

adjournment to allow Green to obtain additional medical records and to attempt to secure

legal representation.  (Id. at 377, 387, 391).  Despite the adjournment, Green proceeded

pro se at both sessions.  (Id. at 377, 391).

                By decision dated March 15, 2001, the ALJ found that Green was not

disabled within the meaning of the Act.  (Id. at 33-42).  After Green requested review of

the ALJ's decision, (id. at 72-73), the Appeals Council remanded his case to the ALJ on

November 30, 2001, with instructions to secure the testimony of a vocational expert to

clarify whether Green had skills that were transferable to other occupations in accordance

with Social Security Ruling 82-41 (id. at 30-32).  Green then appeared pro se at another

_____

        [1]      Citations to "Tr." refer to the certified copy of the administrative record filed with
the Answer.  (ECF No. 6).

hearing on April 25, 2002, at which the ALJ considered his case de novo.  (Id. at 409-33).
On July 10, 2002, the ALJ again found that Green was not disabled.  (Id. at 98-107).

After Green requested review of the ALJ's second decision, the Appeals
Council remanded the case on June 24, 2005, because the second hearing record could not
be found.  (Id. at 54-56).  The Appeals Council subsequently vacated its remand order on
September 19, 2006, after the tape was located.  (Id. at 8-10).  The ALJ's decision
became final on December 2, 2006, upon the Appeals Council's denial of further review.
(See id. at 5-7).

Green failed to file a civil action seeking judicial review within the required
sixty-day period, but the Appeals Council granted him a thirty-day extension on July 29,
2008.  (Id. at 4).  Green then timely commenced this action by submitting to the Pro Se
Office of this Court a complaint that was received on August 21, 2008.  (ECF No. 2).
Thereafter, on November 21, 2008, Your Honor referred the case to me for a Report and
Recommendation.  (ECF No. 3).

On May 13, 2009, the Commissioner filed a motion for judgment on the
pleadings pursuant to Rule 12(c).  (ECF Nos. 8 (Notice of Mot.), 9 ("Comm'r's Mem.")).
Green filed an affirmation in opposition to the motion on May 19, 2009. (ECF No. 10
("Green Opp'n")).  The Commissioner then filed a reply memorandum in further support
of the motion for judgment on the pleadings on July 6, 2009.  (ECF No. 12 ("Reply")).

The issue presented by the motion is whether the ALJ's determination that
Green was not disabled within the meaning of the Act at any time from February 1, 1999

3

(the date Green alleges he became unable to work due to his disability), through July 10,

2002 (the date of the ALJ's second decision), is legally correct and supported by

substantial evidence.  (See Comm'r's Mem. at 3).

II.    Relevant Facts[2]

    A.    Non-Medical Evidence

        1.    Green

Green was born on January 3, 1966, obtained a GED degree, and took some

college courses.  (Tr. 120, 148, 397).  He joined the United States Navy, but in 1988, after

four years of service, received an honorable discharge and was placed on the Navy's

temporary disability list because he had suffered a seizure.  (Id. at 120, 252-54, 395-97).

The terms of his discharge afforded him a fifty-percent Veterans Administration ("VA")

disability pension.  (Id. at 396).  Green nevertheless worked as a security guard and an

---

    [2]    As part of his opposition papers, Green submitted additional medical records
relating to the period from 2007 through 2009.  (See Green Opp'n Attachs.).  The Commissioner
contends that the Court should not consider these records because they are not relevant to the
time period at issue.  (Reply at 4-6).  Section 205(g) of the Act provides that a court may order
the Commissioner to consider additional evidence upon remand only upon a showing that it is
material and that there is good cause for the failure to incorporate it into the record in a prior
proceeding.  See 42 U.S.C. § 405(g); see also Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)
(new evidence may only be considered if it is not merely cumulative, it is material to the
considered time period, and there is good cause for the earlier failure to include it).  To meet the
materiality standard, there must be "a reasonable possibility that the new evidence would have
influenced the Commissioner to decide [the] claimant's application differently."  Pollard v.
Halter, 377 F.3d 183, 193 (2d Cir. 2004) (internal brackets omitted).  Here, the Commissioner is
correct that the new medical records are not material to the relevant time period.  Accordingly,
this additional information has not been considered in this Report and Recommendation.  Green
nevertheless may wish to incorporate the new evidence into an application seeking disability
insurance benefits for a later time period.

electrician's helper after his discharge.  (Id. at 127, 133-34, 143, 151, 397, 415).  He last

worked (as a security guard) on February 1, 1999.  (Id. at 142).  At the time of the hearing

in 2002, Green was thirty-six years old and lived in a first floor apartment with his wife,

Valerie Green ("Mrs. Green"), and one of their two daughters.  (Id. at 121, 413-14).

   In a Disability Report dated September 24, 1999, Green explained that he

held a series of security guard jobs, but proved to be "more of a burden than a help"

because his seizures were not controlled and took place "in front of customers."  (Id. at

149-50).  His seizures also adversely affected his work attendance because employers

would ask him to reduce his hours or stay home.  (Id. at 142).  Green reported that his

most recent security guard job required him to walk four hours per day, stand two hours

per day, sit two hours per day, and write, type, or handle small objects for two hours per

day.  (Id. at 151-52).  He also had to lift and carry for short distances merchandise

weighing less than ten pounds that had been seized from shoplifters.  (Id. at 152).  In a

subsequent submission to the SSA, Green explained that his seizures rendered him unable

to drive or travel alone using public transportation.  (Id. at 139).

   Green also applied for a position as a part-time flexible mail handler for the

United States Postal Service.  On May 19, 1999, however, the Postal Service notified

Green that the agency would not hire him because its medical officer's examination and

review of Green's medical records indicated that Green's "[n]eurological [c]ondition"

placed him in a "High Risk Category."  (Id. at 292).  The Postal Service reiterated its

decision by letter dated September 28, 1999, explaining that the mail handler job would

entail working around moving objects and vehicles, and arduous activities such as moving bulk mail, which appeared to be incompatible with Green's condition.  (Id. at 293).  Green was entitled to an automatic review of that decision as a disabled veteran, but the United States Office of Personnel Management, by letter dated November 22, 1999, agreed that Green's medical condition posed an "unacceptable safety and health risk" that was "likely to adversely affect [his] ability to perform the full range of duties required for the position."  (Id. at 293-94).

During his first substantive hearing before the ALJ on January 25, 2001, Green elaborated on the points made in his application for benefits, stating that he had his first seizure in or around 1984 while he was in the Navy and woke up two weeks later on a hospital ship.  (Id. at 396).  He also explained that his seizures were the cause for his checkered work history, which reflected "bouncing back and forth . . . from job to job." (Id. at 398).

Green testified that when he had seizures he often would "black out . . . without urinating on [him]self," but at other times would "lose consciousness and urinate on [him]self and things to that [e]ffect."  (Id. at 400).  Following the instructions of his doctors, he would go to the hospital only if he had a "straight seizure" lasting "over five minutes."  (Id. at 401).  Green further testified that he recently had started seeing a psychiatrist who prescribed Zoloft for his depression.  (Id. at 402-03).

During the post-remand hearing on April 25, 2002, Green testified that he had not worked since his last appearance.  (Id. at 415).  He also explained that his doctor

had told him that not all seizure activity could be detected by an EEG (electroencephalogram).  (Id. at 417-18).  Green complained of weakness in his left hand that had worsened over time and caused him to be "always dropping things."  (Id. at 418). He also indicated that the various drugs he was taking caused him to sleep "most of the day."  (Id. at 419-20).  Green noted that he had balance problems and felt "wobbly" at times.  (Id. at 420).  Despite these difficulties, Green thought that he could lift, carry, push, or pull an appropriate weight for a man of his size.  (Id.).

2.    Mrs. Green

Mrs. Green also testified on behalf of her husband at both hearings.  During the first hearing, she said that Green had been to the hospital "two or three" times over the past few years for his seizures.  (Id. at 401).  She further testified that her husband had "real bad memory loss" and was having seizures as often as three times per week.  (Id. at 407).  She opined that Green could not function outside, citing an instance in which he went to the store alone and emerged not knowing where he was.  (Id. at 407-08).

During the second hearing, Mrs. Green testified that when her husband had seizures he often would "black out" and become unresponsive for a "couple of minutes." (Id. at 422-23).  Mrs. Green further explained that, at times, Green would have seizures while he slept that involved shaking and unresponsiveness.  (Id. at 423).  She also indicated that he was depressed, noting that he sometimes would become "snappy."  (Id.).

### 3.   Vocational Expert

At the second hearing, Vocational Rehabilitation Counselor Andrew Pasternak ("Pasternak") testified that Green's past work involved jobs that were classified as light[3] and semi-skilled,[4] and fell into two categories. (Id. at 425-31). The first category, merchant patroller, consisted of semi-skilled work with a specific vocational preparation ("SVP")[5] of 3. (Id. at 428). The second category, security guard, entailed light physical exertion and also had a SVP of 3. (Id.). Pasternak concluded that a hypothetical person with the same age, education, past relevant work, and limitations as Green could not perform Green's past work. (Id. at 429). Pasternak testified, however, that such a person could perform other jobs that existed in the local or national economy, such as a surveillance system monitor, photocopy machine operator, mailroom clerk, order filler, and hand packer. (Id. at 430-31).

---

[3]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "[A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id.

[4]   Semi-skilled work "may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury. . . ." A job may be considered semi-skilled "where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." Id. § 404.1568(b).

[5]   Specific vocational preparation is the amount of time required to learn techniques and information and develop the facility needed for the performance of a job. Silvestro v. Astrue, No. 07 Civ. 9554 (VB) (LMS), 2011 WL 5142754, at *18 n.5 (S.D.N.Y. Aug. 23, 2012) (citing Dictionary of Occupational Titles, Appendix C).

8

B.    Medical Evidence

After his discharge from the military, Green began treatment as an outpatient at a VA Hospital in the Bronx.  (Id. at 254, 255).  In September 1988, a VA physician diagnosed Green as having a seizure disorder and sought a neurological consult based on Green's "recent onset of grand mal seizures."[6]  (Id. at 286-88).  At the time, Green's medical records indicated that he already had been prescribed and was taking Tegretol.[7]  (Id. at 286, 288).  Green's use of the medication was intermittent; he stopped taking it for a two month period without incident in 1989, began again, then stopped in 1990.  (Id. at 283, 285).  In December 1993, Green returned to the VA, reporting severe headaches, sharp pains above his left eye, stabbing pains at the back of his head, and uncontrollable shaking in his left hand.  (Id. at 283).  Green was diagnosed with abnormal involuntary movements and migraines.  (Id. at 282).  Over the ensuing years, Green was treated by a number of doctors at VA Hospitals in the Bronx and Manhattan.

---

[6]    A grand mal seizure, also known as a generalized tonic-clonic seizure, is defined as "a generalized seizure characterized by the sudden onset of tonic contraction of the muscles often associated with a cry or moan, and frequently resulting in a fall to the ground."  Stedman's Medical Dictionary (27th ed. 2000), available at Westlaw STEDMANS, [hereinafter "Stedman's"].

[7]    Tegretol is an anti-seizure medication.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000620/ (last visited Apr. 19, 2012).

1.    <u>Dr. Maria Muxfeldt - Treating Physician</u>

    a.    <u>Evidence Prior to Period at Issue</u>

Green underwent a sleep-deprived EEG at the Bronx VA in 1994, which Dr. Maria Muxfeldt interpreted as abnormal because it reflected an electrographic seizure[8] lasting approximately thirty seconds. (<u>Id.</u> at 234). Dr. Muxfeldt's impression was that the EEG was consistent with a history of epilepsy. (<u>Id.</u>). Dr. Muxfeldt conducted another EEG on July 24, 1995, which displayed a mildly abnormal record, suggesting structural damage to Green's left temporal lobe. (<u>Id.</u> at 217). There were, however, "no epileptiform abnormalities in the record." (<u>Id.</u>). A 1995 MRI of the brain noted no abnormal signals, with the exception of an infection (left maxillary sinusitis). (<u>Id.</u> at 239). Green's 1997 progress notes indicate that his last seizure had taken place six months earlier and that his seizure frequency was once per year, with the onset often related to sleep deprivation. (<u>Id.</u> at 233).

On January 20, 1998, Green visited the Bronx VA Hospital emergency room and was prescribed Tegretol after suffering a seizure for the first time in nine months. That seizure, which had occurred four days earlier, caused a stabbing sensation behind Green's right eye and blurry vision. (<u>Id.</u> at 202).

On September 16, 1998, Green returned to the Bronx VA Hospital. Green complained of sporadic pulsating headaches that woke him at night, but which were

---

[8]    An electrographic seizure, also known as a subclinical seizure, is defined as "a seizure detected by EEG, which has no clinical correlate." <u>Stedman's</u>.

relieved with Advil "after a while."  (Id. at 240).  Upon physical examination, Green

demonstrated a full range of motion of the head, intact cranial nerves, and no sinus

tenderness.  (Id.).  A trial of Elavil[9] was prescribed.

Green returned to the Bronx VA Hospital on October 30, 1998, reporting a

seizure the previous night, and was prescribed Tegretol.  (Id. at 196).  Dr. Muxfeldt's

notes for the remainder of 1998 indicate that Green continued to experience headaches,

and that he suffered an additional seizure during the week prior to November 10, 1998.

(Id. at 208-11).

b.      Period at Issue

Dr. Muxfeldt continued to treat Green on an outpatient basis at the Bronx

VA Hospital from February through August 1999.  (Id. at 166-248, 291, 296).  Dr.

Muxfeldt's notes of a visit on February 2, 1999, indicate that Green had not had any

further seizures since his last visit, which appears to have been on December 1, 1998.  (Id.

at 206, 208).  On May 4, 1999, Dr. Muxfeldt wrote that Green had cluster headaches one

to two times per week.  (Id. at 204).  On August 10, 1999, Dr. Muxfeldt wrote that Green

had suffered no recent seizures but continued to experience occasional headaches which

responded to Motrin.  He also had numbness and pain in the ulnar aspect of his left

forearm.  (Id. at 170).  A physical examination resulted in findings of a normal gait, mild

weakness of the left hand, no sensory deficit, and equal reflexes.  Dr. Muxfeldt's

---

[9]      Elavil increases "the amounts of certain natural substances in the brain that are
needed to maintain mental balance" and is used to treat symptoms of depression.  See
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666/ (last visited Apr. 19, 2012).

impression was well-controlled seizures, tolerable headaches, and either ulnar neuropathy[10] or left cervical radiculopathy.[11]   She prescribed further Tegretol for the seizures and Motrin for the headaches.  (Id.).

Dr. Muxfeldt examined Green again on August 31, 1999, after he reported that he may have suffered a seizure and was experiencing left hand tingling.  (Id. at 166, 296).  The doctor increased Green's Tegretol dosage and noted as her impression one recent break-through seizure[12] and mild left hand weakness due to radial nerve palsy.[13] (Id.).  This was Green's first reported seizure since the alleged onset of his disability in February 1999.

2.      Dr. Josephine Rim - Treating Physician

On August 17, 1999,  Dr. Josephine Rim of the Bronx VA Hospital examined Green for his history of seizure disorder, complaints of left forearm numbness and tingling, and reports of dropping objects from his hands.  (Id. at 167-69, 171-72). Her examination found decreased sensation on the left forearm in radial nerve distribution and decreased motor strength of the left wrist extension.  (Id. at 168).  A left radial nerve

---

[10]      The contemporary use of neuropathy refers to "a disease involving the cranial nerves or the peripheral or autonomic nervous system."  Stedman's.

[11]      Radiculopathy is defined as a "[d]isorder of the spinal nerve roots."  Id.

[12]      A break-through seizure is defined as a "[s]udden unexpected seizure[] in someone who previously had achieved reliable control."  See http://old.epilepsyfoundation.org/ about/treatment/medications/breakthrough.cfm (last visited Apr. 19, 2012).

[13]      Radial nerve palsy refers to paralysis of the radial nerve.  See Stedman's.  The radial nerve "supplies the muscles of the posterior compartments of the arm and forearm and overlying skin."  Id.

study revealed slow conduction velocity.  (Id. at 169, 171).  Additionally, an EMG
revealed electrical evidence of membrane instability in muscles innervated by the radial
nerve below the left triceps.  There was no evidence of cervical radiculopathy.  (Id.).  Dr.
Rim advised Green to avoid pressure on his left upper arm near the left spiral groove.[14]
(Id. at 167, 169, 171).

3.     Dr. Anjan Chatterjee - Treating Neurologist

During the relevant period, Green received outpatient treatment at the
Manhattan VA Hospital from October 1999 through June 2002.  (Id. at 161-65, 257-80,
295, 304, 323-30, 339-49, 373-74).  On October 5, 1999, neurologist Dr. Anjan
Chatterjee saw Green after he had a seizure earlier that day.  (Id. at 258, 346-47).  Green
stated that his seizure control had worsened over the past year, and that he was now
having seizures one to two times per month.  (Id. at 258).  Green described the seizure as
a tingling in his hands and feet, followed by shaking of his arms and legs, during which
time he would be unresponsive but able to maintain bowel and bladder control.  (Id.).  Dr.
Chatterjee's examination found normal mental status, cranials, and gait, and no
confusion, aphasia,[15] Romberg sign ("Romberg"),[16] tremors, or ataxia.[17]  (Id.).

---

[14]     The spiral or radial groove is a shallow groove passing around the shaft of the
humerus that lodges the radial nerve and deep brachial artery.  Id.

[15]     Aphasia is defined as "[i]mpaired or absent comprehension or production of, or
communication by, speech, writing, or signs, due to an acquired lesion of the dominant cerebral
hemisphere."  Id.

[16]     A Romberg sign is determined by the Romberg test.  Id.  "[I]f closing the eyes
increases the unsteadiness, a loss of proprioceptive control is indicated, and the sign is positive."
(continued...)

13

4.      Dr. Xi Chen - Treating Neurologist

Green was seen by Dr. Xi Chen of the Manhattan VA Hospital on October 14, 1999.  (Id. at 264, 280).  Green reported that his last seizure had occurred two days earlier, lasted two to three minutes, and involved screaming before "drop[ping] to the floor."  (Id.).  Green further stated that most of his seizures occurred in the morning, and that he had a tendency to drop things suddenly.  (Id.).  Dr. Chen recommended increasing Green's dosage of Tegretol and that he have an EEG.  (Id.).  Thereafter, on October 19, 1999, Green underwent an EEG, which neurologist Dr. Richard Hanson interpreted as normal.  (Id. at 373).

On October 28, 1999, Green reported another seizure to Dr. Chen, who again increased his Tegretol dosage.  (Id. at 263, 279).  Green stated that the frequency of his seizures had increased from five per year to five per month.  (Id.).  Dr. Chen also completed a medical form that day for the New York State Division of Disability Determination.  (Id. at 339-45).[18]  On that form, described Green's symptoms as generalized tonic-clonic seizures that were diurnal (i.e., taking place in the daytime) and occurring four times per month.  (Id. at 339, 343).  Dr. Chen further indicated that Green

_____

[16](...continued)
Id.  Proprioceptive control is the capability to receive stimuli originating in muscles, tendons, and other internal tissues.  Id.

[17]      Ataxia is "[a]n inability to coordinate muscle activity during voluntary movement; most often due to disorders of the cerebellum or the posterior columns of the spinal cord."  Id.

[18]      Dr. Chen signed the report, but not on the signature line.  (Tr. 345).

14

was being treated with Tegretol, which had resulted only in "partial control." (Id. at 340).

Dr. Chen wrote that Green had normal cranial nerves, deep tendon reflexes, motor

strength, station and gait, gross and fine manipulation, movements, sensations, mental

status, and communication ability. (Id. at 340-42). The doctor further reported no

limitations on Green's abilities to lift and carry, stand and/or walk, and push and/or pull.

(Id. at 344-45). Indeed, the only limitations that Dr. Chen described related to "driving or

other dangerous environments." (Id. at 345).

At the request of Dr. Chen, Green had an MRI of his brain at the Manhattan

VA Hospital on December 2, 1999. Staff radiologist Dr. Lynette T. Masters interpreted

the MRI results as normal. (Id. at 295, 349). That same day, Green told Dr. Chen that he

had experienced a seizure four days earlier. After Dr. Chen conducted an examination

that revealed that Green had no nystagmus[19] and a steady gait, the doctor continued

Green's Tegretol treatment. (Id. at 262, 278).

On January 13, 2000, Dr. Chen prescribed Depakote,[20] noting that Green

was still having seizures about once a week, although his neurological exam results were

unchanged. (Id. at 261, 277). On that date, Dr. Chen also had a telephone consultation

with G. Williamson of the State Division of Disability Determination. (Id. at 330). Mr.

Williamson's report indicates that Dr. Chen told him that Green had not had any seizures

---

[19]     Nystagmus is an "[i]nvoluntary rhythmic oscillation of the eyeballs, either
pendular or with a slow and fast component." Stedman's.

[20]     Depakote is a drug used to treat seizure disorders. See http://www.ncbi.nlm.
nih.gov/pubmedhealth/PMH0000677/ (last visited Apr. 19, 2012).

between 1988 and approximately February 1, 1999, when he began to have "minor motor seizures." (Id.).  The renewed seizures inexplicably always occurred in the morning, between 4 a.m. and 8 a.m., while Green was sleeping, and left him in a confused state for approximately fifteen to thirty minutes.  (Id.).  The record further indicates that Green could work in a low stress environment, but perhaps only during the afternoon and evening hours, "so he won't be stressed out trying [to] go to work in the morning after having these episodes."  (Id.).

Green's next visit with Dr. Chen took place on February 17, 2000, at which time the doctor again diagnosed him as having a seizure disorder.  This time the neurological examination revealed an "end gaze nystagmus in [the] left gaze;" the doctor noted, however, that Green was able to tandem walk and had no Romberg.  (Id. at 260, 276).

Dr. Chen completed another form for the Division of Disability Determination on March 16, 2000.  (Id. at 323-29).  His diagnosis remained generalized tonic-clonic seizures,  (id. at 323), but there were changes from his prior report on October 28, 1999.  Dr. Chen reported that the seizures were now nocturnal and occurring once per month.  (Id. at 327).  Dr. Chen also indicated that Green was having problems with gross/fine manipulation of his "fingers/hands/arms" in that his ability to engage in rapid alternating movements and fine manipulation was abnormal.  (Id. at 325).

Green also saw Dr. Chen on October 12, 2000, at which time he reported having seizures two to three times per month.  (Id. at 257).  Green's neurological exam

16

was negative for nystagmus, tremor, and Romberg.  Dr. Chen's impression was a "seizure disorder . . . not well-controlled on Tegretol."  The doctor reduced Green's dosage of Tegretol and increased his dosage of Depakote.  (Id.).

     5.    <u>Dr. Tabasum Mir - Treating Physician</u>

Dr. Tabasum Mir saw Green for a primary care visit on April 18, 2000.  (Id. at 268-70).  Green maintained that he suffered seizures one to two times per week, and had headaches two to three times per week, which were usually one-sided and throbbing, but treated more effectively with Excedrin than with ibuprofen.  (Id.).

     6.    <u>Dr. C. Levit - Consulting Physician</u>

State agency review physician Dr. C. Levit evaluated the evidence as of January 5, 2000, to reach an assessment regarding Green's RFC.  (Id. at 331-38).  Based upon the medical records, Dr. Levit concluded that Green had no exertional limitations, but should not climb or be exposed to environmental hazards, such as machinery and heights.  (Id. at 332, 333, 335).

     7.    <u>Dr. W. H. Wells - Consulting Physician</u>

On March 23, 2000, Dr. W. H. Wells performed a second assessment of Green's RFC based on his review of documents.  (Id. at 315-22).  Contrary to Dr. Levit, Dr. Wells found no limitation with regard to climbing.  (Id. at 317).  He concurred, however, with Dr. Levitt's assessment of environmental limitations.  (Id. at 319).  Dr. Wells also noted that Green was now on Depakote, and that his seizures were occurring once per month.  (Id. at 316).

8.     Dr. Steven Sparr - Treating Physician

Green visited Dr. Steven Sparr at Montefiore Medical Center three times during 2000.[21]  (Id. at 298-303).  During the first visit, on August 17, 2000, Dr. Sparr recorded that Green was having seizures up to three times each week.  (Id. at 300).  Green described the seizure experience as a "sinking feeling," followed by shaking and passing out.  (Id.).  Green also told the doctor that he was suffering from almost daily migraine headaches, for which he took Advil, and that sleep was helpful.  (Id.).  Dr. Sparr further noted that Green claimed to be depressed and that he had not been sleeping well.  (Id. at 301).

Green returned to Dr. Sparr on October 4, 2000, stating that the seizures were less frequent, but still occurred at least weekly, and that his headaches were not improving.  (Id. at 298).

On December 20, 2000, Green told Dr. Sparr that he had "non-severe" migraines, but instead of the generalized seizures he had experienced in the past, more recently heard a loud noise and then felt paralyzed for fifteen seconds.  (Id. at 299).  Dr. Sparr's diagnosis was that Green's seizure disorder was "controlled."  (Id.).

On January 10, 2001,  Dr. Sparr completed a medical assessment of Green's ability to do work-related activities.  (Id. at 249-51).  Green was graded as "good" with respect to his ability to make occupational, performance, and personal-social adjustments.

---

[21]     The Commissioner's memorandum of law mistakenly identifies Dr. Sparr as "Dr. Saaris."  (See Comm'r's Mem. at 11-12; Tr. 302).

(Id. at 250-51).  Dr. Sparr nevertheless assessed Green as unable to perform his past job as a security guard due to his "frequent seizures."  (Id. at 251).

9.    Dr. Andrew Ivanson - Consulting Neurologist

On September 21, 2000, Dr. Andrew Ivanson, a consulting neurologist, examined Green.  (Id. at 305-08).  Green complained of two seizures in the past week, stating that he suffered six diurnal or nocturnal grand mal seizures every month.  (Id. at 305).  He described the incidents as shaking on both sides of his body that lasted several minutes, followed by five or ten minutes of confusion and loss of consciousness, with tongue biting and spontaneous urination.  (Id.).  Green reported a history of approximately one intermittent throbbing headache per month, "well-controlled with Imitrex."[22]  (Id. at 305).  Green described his daily activities as including television, reading, relaxing, socializing, and doing household chores and shopping unassisted.  (Id. at 306).

Dr. Ivanson found Green to have normal mental status, cranial nerves, deep tendon reflexes, and coordination.  Green's sensory and motor examinations also were normal.  (Id. at 306-07).  The doctor's impression was that Green had a history of "poorly controlled generalized tonic-clonic seizures."  (Id. at 307).  Dr. Ivanson opined that Green was "very unlikely to have a normal EEG test with the amount of seizures [he] reported" and, therefore, might be "exaggerating the amount of seizures he reported because only

_____

[22]    Imitrex is the brand name for sumatriptan, a drug used to treat migraine headaches.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000102/ (last visited Apr. 19, 2012).

19

this can explain why his EEG test was normal." (Id.).  The doctor found no limitations

with respect to Green's ability to sit, speak, hear, stand, walk, travel, push, pull, lift,

handle, or finger objects, but recommended that Green avoid activities requiring

climbing, balancing, heights, and operating dangerous equipment, or other activities that

could place him at risk of injury.  (Id.).

      10.    Dr. Maria Alexianu - Treating Neurologist

On July 26, 2001, Dr. Maria Alexianu of the Manhattan VA Neurology

Clinic examined Green, finding that he was negative for nystagmus, tremor, and

Romberg.  (Id. at 161).  During the visit, Green reported that he still suffered from

seizures about two to three times per month.  (Id.).  The doctor concluded that Green's

seizure disorder was not well-controlled, and that it was likely that his Tegretol and

Depakote prescriptions interfered with each other.  (Id.).  On January 24, 2002, Dr.

Alexianu reached the same determination, after Green reported that he had three seizure

episodes in less than six months,[23] that the latest seizure took place one month earlier, and

that it was accompanied by a "funny feeling," loss of consciousness, and incontinence.

(Id. at 164).

---

[23]    The physicians at the VA Hospital used the "greater than" and "less than" mathematical symbols (› ‹) to describe Green's seizure frequency.  In some instances, the inconsistent use of these symbols could be read to suggest that the number of seizures listed occurred in a period greater than the period specifically identified.  (See, e.g., Tr. 164).  Since that makes little sense (for example, a period greater than six months could be seven months or seven years), I have interpreted both symbols to mean "less than."

11.   Dr. Siddharth Kapoor - Treating Neurologist

a.   Period at Issue

On June 20, 2002, Green was seen by Dr. Siddharth Kapoor, Chief Neurology Resident at the Manhattan VA Hospital.  (Id. at 367-68).  Dr. Kapoor conducted a neurological exam and noted that there was no evidence of nystagmus, tremor, or Romberg.  Green nevertheless reported suffering three nocturnal seizures in less than six months.  Dr. Kapoor's impression was that Green had a seizure disorder that was not well-controlled on Tegretol and Depakote, and prescribed Lamictal[24] to be taken in addition to Depakote.  (Id.).

b.   Evidence after Period at Issue

After the relevant period, but prior to the second Appeals Council review, Green continued outpatient treatment at the Manhattan VA Hospital from September 2002 through March 2003.  (Id. at 356-71).  On September 30, 2002, Dr. Eu-Meng Law, a radiologist, performed an MRI of Green's brain at the request of Dr. Kapoor and found that the MRI was normal.  (Id. at 369).  Subsequently, Green saw Dr. Kapoor on October 3, 2002.  (Id. at 366-67).  By then, he was taking Tegretol and Depakote, which had provided better, but still unsatisfactory, control.  Green reported having had three nocturnal seizures in less than six months, including two in the previous two weeks, which Dr. Kapoor concluded were likely to have been generalized tonic-clonic seizures.

---

[24]   Lamictal is the brand name for lamotrigine, a drug used to treat seizures in patients with epilepsy.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000957/ (last visited Apr. 19, 2012).

(Id. at 366).  Dr. Kapoor noted that an MRI of Green's brain was normal, with no evidence of mesial temperal sclerosis.[25]  (Id. at 367).  The doctor described Green's condition as epilepsy of unknown cause, with complex partial seizures[26] and secondary generalization,[27] not well-controlled on Tegretol and Depakote.  (Id. at 366-67). Registered nurse Olga McKenzie screened Green on the same date and noted that he had already been diagnosed with, and was being treated for, depression.  (Id. at 366).

Dr. Kapoor saw Green again on November 7, 2002, noting that there had been no further seizures since the previous visit and that, while there was better control, it remained unsatisfactory.  (Id. at 362-64).

On March 6, 2003, Green had a follow-up visit with Dr. Kapoor, who again found no nystagmus, tremor, or Romberg.  (Id. at 359-60).  Dr. Kapoor noted that Green had suffered three likely generalized tonic-clonic seizures in less than six months, but none since his last visit, and reiterated that while there was better control, it was unsatisfactory.  (Id. at 359).  The doctor also increased Green's dosage of Lamictal.  (Id. at 360).

---

[25]     Mesial temporal sclerosis is a "loss of neurons and scarring of the temporal lobe associated with certain brain injuries." See http://nyp.org/health/mesial-temporal-sclerosis.html (last visited Apr. 19, 2012).

[26]     A complex partial seizure is accompanied by an "impairment of consciousness." Stedman's.

[27]     Secondary generalization refers to "a generalized tonic-clonic seizure that begins with a partial seizure and evolves into a generalized tonic-clonic seizure." See id.

22

12.    Dr. Siddhartha Nadkarni - Treating Neurologist

Green was examined by Dr. Siddhartha Nadkarni at the Manhattan VA on December 12, 2002, after the period at issue.  (Id. at 362).  Green reported one general tonic-clonic seizure and two complex partial seizures since his visit of November 7, 2002 with Dr. Kapoor.  (Id.).  Green stated that he felt like he was constantly in a "bad mood" and had made an appointment to see a psychiatrist.  (Id.).  The examination revealed a mild sustention tremor,[28] gaze-evoked nystagmus, mild left lower facial weakness, and mild drift bilaterally that was more pronounced on the left.  (Id.).  The doctor increased Green's Lamictal dosage.  (Id.).

13.    Dr. Arthur Sinkman - Treating Psychiatrist

a.    Period at Issue

A brief handwritten note by Dr. Arthur Sinkman of the Manhattan VA, dated January 22, 2001, states that Green had been under treatment for depression since November 2, 2000, and was taking Zoloft.  (Id. at 304).

b.    Evidence after Period at Issue

On February 21, 2003, Green visited Dr. Sinkman, whom he had not seen for two years.  (Id. at 360-61).  Dr. Sinkman noted that Green had been treated with Zoloft for three months commencing in November 2000, had a "remission," then stopped taking his medication.  Green reported "doing well" until several months before his visit,

_____

[28]    Sustention tremors are tremors that occur while performing muscular activity. See http://www.mdguidelines.com/tremor/definition (last visited Apr. 19, 2012).

23

when he became depressed and experienced sad mood, low energy, and "bleak," but not

hopeless, feelings.  (Id.).  Dr. Sinkman noted that Green denied suicidal thoughts but felt

"blue . . . angry for nothing," withdrawn, and did not "feel right most of the time."  (Id.).

The doctor wrote that Green was continuing to have three seizures per month, was tired,

could not focus, experienced "a bit" of anxiety, erroneously heard his name called three to

four times every six months, and saw shadows out of the corner of his eyes, although he

knew they were not real.  (Id.).  The mental status examination revealed that Green was

not suicidal, but suffered from sad mood with constricted affect, and hallucinations with

insight, but no delusions.  (Id.).  Dr. Sinkman's impression was that Green was

undergoing a reactive depression to his "disability," that there seemed to be an organic

brain component as manifested by the hallucinations, and that this was probably related to

the seizure disorder and was "VERY unlikely a side effect of his seizure meds."  (Id.).

Dr. Sinkman's diagnosis was depression not otherwise specified and organic

hallucinosis[29] with rule-out organic mood disorder.  He re-prescribed Zoloft and referred

Green to a social worker.  (Id.).

> 14.    Dr. Emily Tan - Treating Physician

After the period at issue, on March 20, 2003, Dr. Emily J. Tan of the

Manhattan VA Hospital examined Green.  (Id. at 356-59).  Green complained of

headaches above the right temporal lobe and eye, occurring mostly in the evening, which

---

[29]    Organic hallucinosis is "the state of experiencing a false sensory perception in the absence of external stimulus observed in individuals with one of the organic mental disorders." Stedman's.

were minimally relieved by Excedrin Migraine.  (Id. at 356).  The headaches were

positive for lacrimation,[30] aura,[31] and photophobia.[32]  (Id.).  Green also complained of

seizures, which, according to his wife, varied between generalized or petit, and occurred

mostly at night with resulting incontinence and tongue-biting.  (Id.).  Dr. Tan prescribed

Naproxen[33] for Green's tension headaches, and continued Green's prescription of

Sertraline (i.e., Zoloft) for depression.  (Id. at 358).

C.   Hearing Testimony

1.   Green

Green's appeared pro se at his first substantive hearing, which took place on

January 25, 2001.  (Id. at 389-408; see also id. at 375-88).  At the outset, Green objected

to Dr. Ivanson's report, which suggested that Green was exaggerating the severity and

frequency of his seizures.  (Id. at 392-93).  Green explained that other doctors had

provided reasons why his symptoms would not necessarily be confirmed by an EEG.  (Id.

at 393; see also Green Opp'n at 4, 12-13 (citing Lewis P. Rowland, Merritt's Neurology

998 (11th ed. 2005) ("It is important to remember, therefore, that 10% to 40% of patients

---

[30]    Lacrimation is "[t]he secretion of tears, especially in excess."  Id.

[31]    Aura is defined as:  "1.  Epileptic ictal phenomenon/phenomena perceived only by the patient; 2.  Subjective symptoms at the onset of a migraine headache."  Id.

[32]    Photophobia is a synonym of photalgia, which is defined as "[l]ight-induced pain, especially of the eyes."  See id.

[33]    Naproxen is a nonsteroidal anti-inflammatory drug.  See http://www.medicinenet.com/naproxen/article.htm (last visited Apr. 19, 2012).

with epilepsy do not show epileptiform abnormalities on routine EEG; a normal or nonspecifically abnormal EEG never excludes the diagnosis.")))

Green testified that he was discharged from the Navy after a series of seizures landed him in the hospital.  (Tr. 396).  He further testified that he still was having "a lot of seizures," although they were less intense.  (Id. at 400).  Green elaborated that at times he would black out without urinating, but at other times he would "lose consciousness and urinate on [him]self and things to that [e]ffect."  (Id.).  He explained that he was told to go to the emergency room for seizures only if they lasted over five minutes.  (Id. at 401).  Green also stated that he was being treated for depression, noting that he had not tried to hurt himself, but sometimes got upset with others.  (Id. at 403). He also explained that he heard or saw things that were not there, and had limited his activities because he did not feel safe and did not want to be outdoors when he had a seizure.  (Id. at 404-05).  Finally, Green noted that he was unsteady on his feet, dropped things, was tired most of the day, and did not feel that he could work a full schedule.  (Id. at 406).

Green, still proceeding pro se, also testified at the hearing on April 25, 2002.  He explained that he had experienced major seizures since the prior hearing, for which he had not been hospitalized.  He estimated the frequency of those grand mal seizures as two times per month, with additional blackouts.  (Id. at 415-16).  Green told the ALJ that he also continued to suffer headaches or migraines and had encountered problems with his balance while walking, but had no problems sleeping, pushing,

26

carrying or pulling.  (Id. at 419-20).  Green expressed the view that he had a normal ability to lift, carry, push, and pull for a man his size.  (Id. at 420).

     2.    Mrs. Green

Mrs. Green appeared with Green and testified at both hearings.  (Id. at 407-08, 422-23).  She also helped supply answers to questions directed to her husband.  For example, at the first hearing, Mrs. Green told the ALJ that Green would black out during some of his seizures.  (Id. at 400).  She also advised the ALJ that Green had been hospitalized at the Manhattan VA Hospital "years ago" and had been treated at Fordham Hospital two or three times over the past few years for seizures.  (Id. at 400, 401).  She further explained that her husband had "mood swings every now and then" and spent his days sleeping.  (Id. at 403, 404).

Mrs. Green also testified at the first hearing that her husband had "real bad memory loss," explaining that she "would say something to him and he could go out towards the door and forget just that quick what he was suppose[d] to be doing."  (Id. at 407).  She indicated that this severe memory loss first manifested itself around the time of a spike in the frequency of his seizures, which had taken place over the last few years. Mrs. Green further explained that the seizures varied in frequency from four or five per month to three in one week.  (Id.).  Finally, she indicated that her husband's mental issues rendered him unable to function outside or visit stores alone.  (Id. at 407-08).

At the April 2002 rehearing, Mrs. Green stated that when her husband had a seizure, he would black out for a "couple of minutes," during which he would be "sitting

there," but would not respond if someone spoke to him.  (Id. at 422-23).  Mrs. Green also indicated that her husband would have seizures in his sleep, during which he would shake and become unresponsive for a few minutes.  She noted that her husband also seemed depressed because he was "on edge a lot" and "snappy sometimes."  (Id. at 423).

  3. ALJ Decision

  On July 10, 2002, ALJ Scheer issued his de novo decision, (id. at 48-53), in which he found that Green had severe impairments consisting of epilepsy, left hand neuropathy, and depression, not otherwise specified, (id. at 50), but nonetheless was not disabled within the meaning of the Act (id. at 53).

  At Step One of the required sequential analysis, ALJ Scheer noted the absence of any evidence that Green had engaged in substantial gainful activity since his alleged onset date of February 1, 1999.  (Id. at 49).

  At Step Two, ALJ Scheer summarized the evidence through May 2002 and found that Green had the severe impairments of epilepsy, left hand neuropathy, and depression, not otherwise specified.  (Id. at 49-50).

  Turning to Step Three, the ALJ found that Green did not have any impairments, either alone or in combination, that met or equaled the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").  (Id. at 50).  More specifically, the ALJ concluded with respect to the first two impairments that the record evidence did not establish that Green had "the requisite number of seizures or peripheral neuropathies" to satisfy the criteria of Listing 11.00.  (Id.).

28

The ALJ further found that, although Green was being treated for depression, he never had ongoing psychiatric counseling or impatient care, and had only mild limitations affecting his functioning in activities of daily living, social interaction, concentration, persistence, and pace. (Id.). Based on these findings, the ALJ determined that (a) Green did not have either an "extreme" limitation in one or "marked" limitations in two of the areas of functioning set forth in the "B" criteria in Listing 12.04, and (b) the record did not show that he had repeated episodes of decompensation, marginal adjustment, extended inability to function outside of a highly supportive living arrangement, or complete inability to function outside of the home, as required by the "C" criteria of that Listing. (Id.). Accordingly, the ALJ concluded that Green's depression did not meet or equal the Listing. (Id.).

At Step Four, ALJ Scheer assessed Green's RFC, which he defined as "the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks." (Id. at 50 (citing 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p, 1996 WL 374184)). After summarizing the Greens' testimony, the ALJ concluded that their statements were "not entirely credible in light of the degree of medical treatment required and discrepancies between [Green's] assertions and information contained in the documentary reports." (Id.). ALJ Scheer noted in that regard that Green had never been hospitalized due to seizure activity and that the record did not reflect the frequency of seizures to which he had testified but instead showed gaps in treatment and a negative cranial MRI. (Id. at 50-51). The ALJ

also noted the lack of both treatment progress notes that could shed light on Green's alleged inability to meet the mental demands of work-related activities and psychometric findings regarding his concentration, attention, memory, insight, and judgment.  (Id. at 51).  ALJ Scheer further observed that Green was right-hand dominant, mitigating the relevance of his diminished left-hand grip strength.  (Id.).  Finally, he emphasized that no treating or examining physician had ever determined that Green was unable to work.  (Id.).

       ALJ Scheer determined that Green retained the RFC to lift and/or carry ten pounds frequently and twenty pounds occasionally, and to sit, stand, and/or walk six hours in an eight hour workday.  (Id.).  He further found that Green's capacity to perform the full range of light work was "limited to work which does not involve heights, moving machinery, driving, or balancing, in a low stress environment, with no repetitive tasks, and allowance of mild weakness of the left non-dominant hand in extension, as well as slight left hand flexion weakness."  (Id.).  These restrictions, the ALJ concluded, rendered Green unable to perform his past relevant work.  (Id.).

       Accordingly, as ALJ Scheer recognized, the Commissioner had the burden of showing at Step Five that Green had the RFC to perform other jobs existing in significant numbers in the national economy.  (Id.).  Based upon the vocational expert's testimony, ALJ Scheer concluded that a significant number of such jobs were available.  (Id. at 52).  The ALJ therefore found that Green was not disabled within the meaning of the Act.  (Id.).

III.     Applicable Law

A.     Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo.  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence.  See Hickson v. Astrue, No. CV-09-2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22,

2011).  When the Commissioner's determination is supported by substantial evidence, the

decision must be upheld, "even if there also is substantial evidence for the plaintiff's

position."  Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

    B.    Duty to Develop the Record

        "Before determining whether the Commissioner's conclusions are

supported by substantial evidence, . . . [a court] must first be satisfied that the claimant

has had a full hearing under the regulations and in accordance with the beneficent

purposes of the Social Security Act."  Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)

(internal quotation marks, ellipsis, and brackets omitted).  Indeed, an ALJ's failure to

develop the record adequately is an independent ground for vacating the ALJ's decision

and remanding the case.  Id. at 114-15.  An ALJ thus has an affirmative duty to develop

the administrative record before making a determination regarding a disability claim.

Perez, 77 F.3d at 47.

    C.    Disability Determination

        The term "disability" is defined in the Act as an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A).  In making a determination as to a claimant's disability, the

Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R.

§§ 404.1520 and 416.920.  The Second Circuit has described that familiar process as

follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant
> suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]
> will consider him disabled without considering vocational
> factors such as age, education, and work experience . . . .
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity to perform
> his past work.  Finally, if the claimant is unable to perform his
> past work, the [Commissioner] then determines whether there
> is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof with respect to the first four steps of

the process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the

Commissioner finds that a claimant is disabled (or not disabled) at an early step in the

process, he is not required to proceed with any further analysis.  See 20 C.F.R.

§ 404.1520(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).  However, if the

analysis reaches the fifth step of the process, the burden shifts to the Commissioner to

show that the claimant is capable of performing other work.  DeChirico, 134 F.3d

at 1180.  In assessing disability, the factors to be considered include "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience."  Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980).

IV.    Application of Facts to Law

        As set forth below, there is substantial evidence to support the Commissioner's findings at the first four steps of the sequential evaluation.  A remand is appropriate, however, because the Commissioner failed to sustain its burden at the fifth step of the analysis.

    A.    First Step

        The first step of the sequential analysis asks whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  Green testified that he stopped working in 1999 because of his alleged disability.  (Tr. 398, 415; see id. at 142-43).  Crediting that testimony, the ALJ determined that Green had not engaged in substantial gainful activity since filing for disability.  (Id. at 49, 52).  There is substantial evidence in the record to support this finding, which, of course, benefitted Green.

    B.    Second Step

        At the second step of the sequential process, the ALJ must determine whether the claimant has a severe impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is one "which significantly limits the abilities and aptitudes necessary to do

most jobs." <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987) (quoting 20 C.F.R.

§§ 404.1520(c) & 404.1521(b)) (internal quotation marks omitted).

The ALJ determined that Green suffered from "severe impairments

consisting of epilepsy, left hand neuropathy, and depression, not otherwise specified."

(Tr. 50).  Given Green's history of doctor visits and medication for these conditions, there

was substantial evidence to support the ALJ's conclusions.  Once again, this finding is

beneficial for Green.

C.    <u>Third Step</u>

The third step of the sequential evaluation asks whether, based solely on the

medical evidence, the claimant has an impairment listed in Appendix 1.  If so, the

Commissioner must find that the claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

The ALJ found, in that regard, that Green's ailments failed to meet or medically equal a

listed impairment.  (Tr. 50).

1.    <u>Depression</u>

To satisfy the criteria for depression under Section 12.04 of Appendix 1, a

claimant, insofar as relevant, must demonstrate <u>either</u> (a) the presence of enumerated

symptoms (under paragraph A) plus at least two enumerated difficulties in daily living,

social functioning, or "concentration, persistence or pace" (under paragraph B); or (b) a

chronic affective disorder of two years' duration affecting basic work activities, plus

(under paragraph C) at least one of the following:  repeated decompensation episodes, a

residual disease process, or a one-year history of inability to function outside of a

supportive living arrangement.  Appendix 1 §§ 12.04(A)-(C).

    Green had several of the listed symptoms of depression, including appetite

and sleep disturbance, decreased energy, difficulty concentrating, and hallucinations.

See id. § 12.04(A)(1).  Nevertheless, the ALJ determined that Green was able to complete

many daily living activities and function socially, and that Green had at most mild

limitations in functioning in activities of daily living, social interaction, concentration,

persistence, or pace.  (Tr. 50).  There is substantial evidence in the record to support these

findings that the paragraph B criteria were not satisfied.  Additionally, the record does not

evidence the sort of chronic problems required by paragraph C.

    2.  Peripheral Neuropathy

    To establish disability due to peripheral neuropathy, Green must show

significant and persistent disorganization of motor function in two extremities, resulting

in sustained disturbance of gross and dexterous movements, or gait and station.  See

Appendix 1 §§ 11.04(B), 11.14.  The ALJ determined that Green did not have the number

of neuropathies required to satisfy the criteria.  (Tr. 50).  Once again, the record contains

substantial evidence consistent with these findings.

    3.  Epilepsy

    The Listings for epilepsy permit disability to be shown through one of two

alternative showings.  First, under Section 11.02, a claimant who alleges disability based

on convulsive epilepsy (either grand mal or psychomotor) must document the existence of

36

a typical seizure pattern, including all associated phenomena, occurring more frequently than once each month despite three months of prescribed treatments, and either daytime episodes involving loss of consciousness and convulsive seizures or nocturnal episodes manifesting residuals that interfere significantly with daytime activity.  Appendix 1 § 11.02.  Under Section 11.03, a claimant alleging that he has nonconvulsive epilepsy, (either petit mal, psychomotor, or focal) must document the existence of a typical seizure pattern including all associated phenomena, occurring more frequently than once per week despite three months of treatment.  To satisfy the Listing, such seizures must be accompanied by "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day."  Id. § 11.03.

The ALJ found, albeit somewhat tersely, that Green did not have "the requisite number of . . . seizures . . . to satisfy the criteria noted under [L]isting 11.00." (Tr. 50).  Later in his ruling, the ALJ also emphasized the dearth of hospitalizations, gaps in Green's treatment, his negative cranial MRI, his unremarkable neurological examinations, and his allegedly effective response to treatment.  (Id. at 50-51).

To be sure, the record with respect to the frequency of Green's seizures is somewhat inconsistent.  For example, from February 1, 1999, the date Green claimed he became disabled, until late August 1999, there appear to have been no recorded seizures. (See, e.g., id. at 166, 170, 206, 208, 296).  On October 5, 1999, just days after Green filed for disability insurance benefits, (id. at 120-22), Dr. Chatterjee recorded Green's seizure

frequency as one to two times per month.  (Id. at 258).  Three weeks later, on October 28,

1999, Green stated that the frequency had increased from five per year to five per month.

(Id. at 263, 279).  On March 16, 2000, Dr. Chen reported the frequency as once per

month, (id. at 327, 329), but later that year, Dr. Sparr documented seizures occurring up

to three times weekly, (id. at 300), and Dr. Ivanson noted Green's estimate that they

occurred six times monthly (id. at 305).  Dr. Ivanson expressed doubt, however, as to the

accuracy of Green's estimate.  (Id. at 307) ("I . . . suspect that maybe he is

exaggerating . . . because only this can explain why his EEG test was normal.").

   Although the records regarding 2001 are sparse, Green did report to Dr.

Alexianu on July 26 that he was experiencing seizures two to three times per month.  (Id.

at 161).  Dr. Alexianu's report of January 24, 2002, however, stated that Green had just

three seizure episodes in less than six months, (id. at 164), as did Dr. Kapoor's reports

concerning two subsequent visits that year (see id. at 366, 368).

   As this summary suggests, virtually all of the evidence that Green was

having frequent debilitating seizures came from self-reporting by Green.  His wife, of

course, also indicated that Green was having serious problems arising out of his frequent

seizures.  Counterbalanced against that evidence, however, is the fact that none of

Green's treating physicians ever suggested that he could not work.  Indeed, two of

Green's physicians (Drs. Chen and Ivanson) concluded that he could work, (see id. at

307, 328-29, 344-45), as did both state agency reviewing physicians (Drs. Levit and

Wells) (id. at 316-19, 332-35).  Moreover, the only EEGs that had slightly abnormal

findings were in 1994 and 1995, (id. at 217, 234), well before the period at issue.  Green's

EEG and an MRI during the relevant period did not result in any abnormal findings.  (Id.

at 295, 349, 373; see also id. at 367 (report of MRI of Green's brain on Oct. 3, 2002,

reflecting a normal examination)).  The medical opinions of the treating and consulting

physicians, together with the objective medical findings, constitute substantial evidence

upon which the ALJ reasonably could rely to find that Green was exaggerating his degree

of impairment and that he did not meet either Listing 11.02 or Listing 11.03.

　　　　　Having properly failed to find that Green had an impairment that met or

equaled the criteria of a listed impairment, the ALJ progressed to the fourth step.

D.    Fourth Step

　　　　　In the fourth step of the sequential evaluation, an ALJ must determine a

claimant's RFC, or what the claimant can do despite his or her impairments.  20 C.F.R.

§ 404.1545(a)(1).  If the claimant can still perform past work, the ALJ must find that the

claimant is not disabled.  Id. § 404.1520(a)(4)(iv).

　　　　　ALJ Scheer found that Green retained the RFC to lift and/or carry ten

pounds frequently and twenty pounds occasionally, and to sit, stand, and/or walk six

hours in an eight-hour workday.  He further concluded that Green's capacity to perform

the full range of light work was limited to work that did "not involve heights, moving

machinery, driving, or balancing, in a low stress environment, with no repetitive tasks,[34]

---

[34]    The restriction involving "no repetitive tasks" is somewhat difficult to understand
since the ALJ previously had found in his first decision that Green was "limited to low stress

(continued...)

and allowance [for] mild weakness of his left non-dominant hand in extension, as well as slight left hand flexion weakness." (Tr. 51). Due to the low stress environment limitation, the ALJ found that Green was unable to return to his past relevant work as a security guard or merchant patroller. (Id.).

The record supports the ALJ's conclusion. Indeed, Dr. Sparr previously had found that Green was unable to return to work as a security guard. (Id. at 251). Hazard limitations also had been placed on Green by the state agency medical consultants. (Id. at 319, 335). Finally, although Green contended that his seizures prevented him from working, even he conceded that he retained the ability to push, carry, and pull. (Id. at 420).

The finding that Green could not perform his prior work benefitted Green since it shifted to the Commissioner the burden of proof with respect to the fifth and final step of the required analysis.

E.    Fifth Step

At the fifth and final step of the sequential process, the Commissioner must prove that there is work the claimant can perform based on the claimant's RFC, age, education, and work experience. See 20 C.F.R. § 404.1520(a)(4)(v). In reaching a determination with respect to this issue, the ALJ may rely on vocational expert testimony

---

[34](...continued)
work[] involving simple, repetitive tasks." (Tr. 39). It is unclear what might have changed between the two hearings to cause the ALJ to change his view regarding Green's suitability for repetitive work.

if there is substantial record evidence to support the assumptions on which the vocational expert based his opinion.  See Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

The ALJ concluded that Green had the RFC to perform work at the light level of exertion, albeit with restrictions.  (Tr. 51).  Relying on the vocational expert's testimony that there were a significant number of jobs in the national economy that Green could perform, including the jobs of surveillance system monitor, photocopy machine operator, mailroom clerk, order filler, and hand packer, (id. at 430-31), the ALJ determined that Green was not disabled within the meaning of the Act (id. at 52).

Green asserts that the surveillance system monitor, photocopy machine operator, and mailroom clerk jobs are not suitable for him because they involve, among other things, high stress work and require constant alertness.  (See Green Opp'n at 9-12). However, the vocational expert took such factors into account in reaching his assessment. (See Tr. 428-31).  Green has not adduced any evidence that the expert's conclusion in this regard was wrong.

Green also alleges that these three jobs are not suitable because they involve exposure to flickering monitors and flashing lights.  (See Green Opp'n at 9, 12). Although the record is silent as to any connection between epilepsy and such environmental conditions, it does appear that a relatively small number of epileptics can have their seizures triggered by flashing or flickering lights.  See http://www.epilepsy.com/

epilepsy/flashing_lights (last visited Apr. 19, 2012).  Here, however, there is no suggestion that Green's seizures were triggered in this manner.  Indeed, the only indicating of sensitivity to light appears in one treatment note by Dr. Tan, who indicated that Green was complaining of headaches accompanied by "photoph[o]bia."  (Tr. 356). This fleeting reference to a symptom of his headaches, rather than a cause of his seizures, consequently does not undercut the ALJ's finding that Green could perform these jobs.

There is one matter that calls into question the correctness of the ALJ's finding that there are jobs in the national economy that Green could perform.  In his decision, the ALJ concluded that Green was limited to light work involving "no repetitive tasks."  (Id. at 51, 52).  When he questioned the vocational expert, however, the ALJ gave him a hypothetical based on a person seeking a job who had problems with his left hand, but was otherwise "capable of performing the exertional demands of a full range of light work to include sedentary, to avoid heights, moving machinery, driving or balancing, have low stress, simple repetitive tasks."  (Id. at 428).  When the ALJ then asked whether the expert wanted any of the hypothetical repeated, the following colloquy ensued:

> A      Perhaps.  Just a second.  Must avoid
>         heights, moving machinery, driving.
>
> Q      And balancing.
>
> A      Balancing.  Okay
>
> Q      Low stress, simple repetitive tasks.  The
>         non-dominant left hand has a mild
>         weakness of hand extension and a slight
>         weakness of left hand flexion.

42

A        Okay. Okay.

(Id. at 428-29).  This exchange suggests that the ALJ believed that Green could, in fact, perform repetitive work that was "light."  Moreover, that view of the record is consistent with the ALJ's first decision in which he found (based in part on Social Security Ruling 88-15) that Green had the RFC to perform "simple, repetitive tasks."  (Id. at 40-41).  As noted previously, however, in his second decision the ALJ concluded that Green could not engage in such work.  (Id. at 51).  If so, the hypothetical question that the ALJ posed was inconsistent with Green's actual RFC.  Furthermore, as Green correctly notes, each of the jobs that the expert concluded were appropriate for Green and available in the national economy appears to be a job that involves the sort of repetitive work that the ALJ's second decision indicates he could not perform.  (See Green Opp'n at 12).  This calls into question whether there is substantial evidence to support the ALJ's decision at Step Five.  A remand therefore is necessary to develop the record in this regard.

In its November 2001 order remanding this case to the ALJ, the Appeals Council directed the ALJ to give "further consideration to [Green's] maximum residual functional capacity and provide appropriate rational with specific references to evidence of record in support of the assessed limitations."  (Tr. 31).  The Appeals Council further directed the ALJ to obtain evidence from a vocational expert who was to be asked hypothetical questions that "reflect[ed] the specific capacity/limitations established by the record as a whole."  (Id. at 32).  In light of these admonitions and the ambiguity in the

43

present record, on remand the ALJ, at a minimum, should clarify the RFC that he believes Green retains and should pose clearly-worded hypotheticals consistent with those findings to the expert.

       Additionally, in his opposition papers, Green complains that the ALJ considered his epilepsy and other medical conditions, but not the effect of his numerous medications, in determining his RFC.  (See Green Opp'n at 2, 10, 12).  Although Green lists several medications that he apparently first began taking after the relevant period, he also identifies some that he was taking during that period.  (See id. at 10-11).  He notes, for example, that Tegretol's side effects include fatigue, vision changes, nausea, dizziness, and confusion.  (Id. at 10).  On remand, therefore, the ALJ also should develop the record to the extent necessary to determine whether Green's medications had any effect on his RFC.

V.    <u>Conclusion</u>

       For the foregoing reasons, the Commissioner's motion for judgment on the pleadings should be granted in part and denied in part, and this case should be remanded solely to develop the record with respect to Green's RFC and the availability of jobs consistent with that RFC.  Further, in view of the passage of time, the Court should retain jurisdiction over this matter so that any further appeal from the ALJ's findings can be considered promptly.

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Loretta A. Preska and to the chambers of the

undersigned at the United States Courthouse, 500 Pearl Street, New York, New York

10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b).  Any requests for an extension of time for filing objections must be directed to

Judge Preska.  The failure to file these timely objections will result in a waiver of those

objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:       New York, New York
             April 24, 2012

                                    FRANK MAAS
                              United States Magistrate Judge

45

Copies to:

George Green
1472 Watson Avenue, Apt. 1K
Bronx, New York 10472

Susan D. Baird
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
(212) 637-2750        (fax)